David Boies (*Pro Hac Vice Application Pending*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
T: (914) 749-8200
F: (914) 749-8300
dboies@bsfllp.com

Andrew S. Gordon (003660)
Vidula U. Patki (030742)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
T:  (602) 224-0999
F:  (602) 224-6020
agordon@cblawyers.com
vpatki@cblawyers.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| SOJOURNER CENTER, | CIVIL ACTION |
| Plaintiff, | Case No. _____ |
| v. | |
| BACKPAGE.COM LLC; EVILEMPIRE.COM; BIGCITY.COM; CARL FERRER; MICHAEL LACEY; JAMES LARKIN; POSTFASTER.COM; WEBSITE TECHNOLOGIES, LLC; IC HOLDINGS, LLC; DARTMOOR HOLDINGS LLC; ATLANTISCHE BEDRIJVEN C.V.; KICKAPOO RIVER INVESTMENTS, LLC; AMSTEL RIVER HOLDINGS, LLC; POSTFASTER, LLC; CLASSIFIED SOLUTION LTD; MEDALIST HOLDINGS, INC.; CAMARILLO HOLDINGS, LLC; UGC TECH GROUP C.V.; JOHN E. BRUNST; and SCOTT SPEAR, | **CIVIL COMPLAINT AND JURY DEMAND** |
| Defendants. | |

{00276854.1 }

Plaintiff Sojourner Center, by and through its attorneys, alleges, upon personal knowledge of its own acts and status and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This case seeks to hold Defendants accountable for creating online content designed to facilitate sex trafficking and for deliberately obscuring evidence of criminal behavior to ensure that they continue to profit from the exploitation of children for sex.  Indeed, Defendants made millions of dollars in profits each year from websites that they designed and intended to be used, and that they knew were being used, for illegal sex trafficking, including of children.

2.      Defendants were repeatedly notified that their websites facilitated human sex trafficking by law enforcement personnel in multiple states, by all 51 state attorneys general, and by the United States Senate, which passed two resolutions condemning Backpage for its involvement in child sex trafficking.

3.      Human trafficking includes selling, soliciting, or advertising the sexual acts of children and coerced adults.  Sex trafficking victims are forced to have sex against their will, while others profit.  The traffickers that Defendants assist use multiple methods to force trafficked adults and children to exchange sex for something of value.  These techniques include physical violence, threats, psychological manipulation, intimidation, and fraud, among other methods.  Human trafficking generates billions of dollars each year, making it the second most profitable transnational crime (after drug trafficking).  Human Trafficking Investigation: Hearing before the S. Permanent Subcomm. on Investigations of the S. Comm. on Homeland Sec. and Gov't Affairs, 114th Cong. 53-88 (2015) (Staff Report) at 4, *available at* http://www.hsgac.senate.gov/subcommittees/investigations/hearings/human-trafficking-investigation (hereinafter, "Senate Report").

4.      In the United States, 1.5 million people are trafficked at any given point in time. *Child Trafficking Statistics*, Ark of Hope (Mar. 19, 2016), *available at* http://arkofhopeforchildren.org/child-trafficking/child-trafficking-statistics.  The majority of

sex-trafficking victims in the United States are children, 63% of whom were advertised or sold online.  Senate Report at 4; Vanessa Bouché, *A Report on the Use of Technology to Recruit, Groom, and Sell Domestic Minor Sex Trafficking Victims* (Jan. 2015) at 19, *available at* https://www.wearethorn.org/wp-content/uploads/2015/02/Survivor_Survey_r5.pdf.   In 2015, the National Center for Missing and Exploited Children ("NCMEC"), the leading organization for resources and information about missing and exploited children, reported that at least 71% of the reports it receives of trafficked children involve Backpage.com.  Senate Report at 6.

5.      Several examples of advertisements found on Backpage are excerpted below.  According to NCMEC and law enforcement, these advertisements were used to sell the sexual services of a trafficked child:

> ♡♥♡♥Exotic Young and Inexperienced ♥♡♥♡I dont know no better♥♡♥♡Soo i might just do it♥♡♥♡ - 18 you didn't get to see HERE'S YOUR CHANCE.. REAL PIC, NO RUSH PLUS I LIKE. WHAT I DO EVEN THOUGH I JUST STARTED

> 3 juicy wet kitties ready to be played with as we rotate around we please you with warming attitudes and open minded decisions were everything you been looking for

6.      Defendants actively participate in the creation of advertisements that traffic children by providing content, authoring text, deleting text, and editing information.  Defendants also change the content of advertisements submitted by traffickers with code words.  Defendants rewrite the advertisements in part to obscure the illegal activity—the sale of a trafficked adult or child for sex.  Of course, the age of the child, or the nature of the illegal transaction proposed, does not change merely because she is no longer described as "young" or a "lolita."

7.      Defendants conspired and continue to conspire with traffickers to ensure that the advertisements posted on Backpage are successful, earning both Defendants and the traffickers enormous profits from the sexual exploitation of children and coerced adults.

8.      The United States Senate Permanent Subcommittee on Investigations (the "Subcommittee") commissioned a 20-month investigation of online sex trafficking that resulted in the review of over one billion pages of documents, a public hearing, and the release of two

incriminating reports.  The United States Senate reported that its "investigation reveals that Backpage clearly understands that a substantial amount of child sex trafficking takes place on its website."  Human Trafficking Investigation: Hearing before the S. Permanent Subcomm. on Investigations of the S. Comm. on Homeland Sec. and Gov't Affairs, 115th Cong. 53-88 (2017) (Staff Report) at 4, *available at* https://www.hsgac.senate.gov/subcommittees/investigations/ reports (hereinafter "2017 Senate Report") at 39.  The United States Senate identified Backpage as the "most important player" in the sex trafficking market and reported that "public records reveal hundreds of reported cases of underage sex trafficking connected to Backpage."  Senate Report at 1.

9.     The facts revealed in both Senate Reports confirm that Defendants have engaged in an elaborate RICO conspiracy, violating multiple federal laws, including laws prohibiting trafficking minors over interstate lines for sex and laundering money to hide illegitimate gains and evade law enforcement.  As a result of this enterprise, the prevalence and frequency of online sex trafficking has increased more than it would have absent the RICO conspiracy.

10.    Plaintiff Sojourner Center is a non-profit organization located in Phoenix, Arizona that provides shelter, support, counseling, and care to trafficking victims and survivors of domestic violence.  In 2016, Sojourner Center treated and cared for at least 42 trafficked individuals, and has provided actual shelter, counseling, and support to at least 15 young women and children trafficked on Backpage.  As a result of servicing trafficking victims listed on Backpage, significant resources, time, staff, and funds have been diverted and drained from Sojourner Center and its mission to end domestic violence has been frustrated, as it has had to provide necessary support and shelter to trafficking victims.

11.    The increase in sex trafficking caused by Defendants' conspiracy has additionally harmed Plaintiff Sojourner Center, separate and apart from the harm caused to Sojourner Center by Defendants.  The Defendants' RICO conspiracy and enterprise has caused the number of trafficking victims to increase, simultaneously increasing the amount of resources Sojourner Center must expend to care for trafficking victims.

**THE PARTIES**

12.     Defendant Backpage.com LLC is a Delaware Limited Liability Company with its principal place of business in Dallas, Texas.  Backpage.com LLC owns, operates, designs, and controls the website that does business as Backpage.com ("Backpage"), including its content.  At all times material hereto, Defendant Backpage.com LLC transacted business in Arizona.

13.     Defendant EvilEmpire.com is a website whose content, services, and features are controlled by Backpage.com LLC.  Defendant EvilEmpire.com is owned and operated by the same Defendants that own and operate Backpage.com LLC.  At all times material hereto, Defendant EvilEmpire.com transacted business in Arizona.

14.     Defendant BigCity.com is a website whose content, services, and features are controlled by Backpage.com LLC.  Defendant BigCity.com is owned and operated by the same Defendants that own and operate Backpage.com LLC.  At all times material hereto, Defendant BigCity.com transacted business in Arizona.

15.     Defendant Carl Ferrer is the CEO of Backpage.com LLC and is an owner of Defendant Dartmoor Holdings LLC.  Defendant Ferrer is also the CEO of Defendant Classified Solutions LTD.  At all times material hereto, Defendant Ferrer transacted business in Arizona, including through Backpage.

16.     Defendant Michael Lacey is an owner of Backpage.com LLC.  At all times material hereto, Defendant Lacey transacted business in Arizona, including through Backpage.

17.     Defendant James Larkin is an owner of Backpage.com LLC and is the CEO and President of Defendant Website Technologies, LLC.  At all times material hereto, Defendant Larkin transacted business in Arizona, including through Backpage.

18.     Defendant Postfaster.com is a website whose content, services, and features are controlled by the same Defendants that own and operate Backpage.com LLC.  Defendant Postfaster.com is located at Kiezersgracht 127, 1015 CJ, Amsterdam, Netherlands.  At all times material hereto, Defendant Postfaster.com transacted business in Arizona.

19.     Defendant Website Technologies, LLC is an owner of Backpage.com LLC.  Website Technologies, LLC pays the employees of Backpage.com LLC.  It also participates in

the control and operation of Backpage.com LLC.  Defendant Website Technologies, LLC, itself, is controlled and operated by the same Defendants that own and operate Backpage.com LLC.  Website Technologies is located at 815 N First Ave. #4, Phoenix, AZ 85003. At all times material hereto, Defendant Website Technologies, LLC transacted business in Arizona, including through its subsidiary Backpage.com, LLC.

20.     Defendant IC Holdings LLC is an owner of Backpage.com LLC.  Defendant IC Holdings LLC participates in the operation and control of Backpage.com, and its affiliated websites.  Defendant IC Holdings LLC is owned and operated by the same Defendants that own and operate Backpage.com LLC, and/or other affiliated entities.  At all times material hereto, Defendant IC Holdings LLC transacted business in Arizona, including through its subsidiary Backpage.com, LLC.

21.     Defendant Dartmoor Holdings LLC is an owner of Backpage.com LLC and is the manager of Website Technologies, LLC.  Dartmoor Holdings LLC participates in the operation and control of Backpage.com, and its affiliated websites, and is owned and operated by the same Defendants that own and operate Backpage.com LLC, or other affiliated entities. Dartmoor Holdings LLC is located at 2501 Oak Lawn Ave, # 700, Dallas, Texas, which is the same location as Backpage.com LLC and websites EvilEmpire.com and BigCity.com, among others.  At all times material hereto, Defendant Dartmoor Holdings LLC transacted business in Arizona, including through its subsidiary Backpage.com, LLC.

22.     Defendant Atlantische Bedrijven C.V. is an owner of Backpage.com LLC and participates in the operation and control of Backpage, and its affiliated websites.  Defendant Atlantische Bedrijven C.V. is a Dutch partnership owned and operated by the same Defendants that own and operate Backpage.com LLC, or other affiliated entities.  At all times material hereto, Defendant Atlantische Bedrijven C.V. transacted business in Arizona, including through its subsidiary Backpage.com, LLC.

23.     Defendant Kickapoo River Investments, LLC is an owner of Backpage.com LLC and participates in the operation and control of Backpage.com, and its affiliated websites. Defendant Kickapoo River Investments, LLC is a Delaware Limited Liability Company and is

owned and operated by the same Defendants that own and operate Backpage.com LLC, or other affiliated entities. At all times material hereto, Defendant Kickapoo River Investments, LLC transacted business in Arizona, including through its subsidiary Backpage.com, LLC.

24.     Defendant Amstel River Holdings, LLC is an owner of Backpage.com LLC and participates in the operation and control of Backpage.com, and its affiliated websites.  Amstel River Holdings, LLC is owned and operated by the same Defendants that own and operate Backpage.com LLC, or other affiliated entities.  Amstel River Holdings, LLC is located at 2501 Oak Lawn Ave, Dallas, Texas, which is the same address listed for Backpage.com LLC, EvilEmpire.com, and BigCity.com.  At all times material hereto, Amstel River Holdings, LLC transacted business in Arizona, including through its subsidiary Backpage.com, LLC.

25.     Defendant Postfaster LLC is owned and operated by the same Defendants that own and operate Backpage.com LLC, or other affiliated entities. Postfaster LLC is a Delaware Limited Liability Company located at 2501 Oak Lawn Ave, #700, Dallas, Texas, which is the same address as Backpage.com LLC, EvilEmpire.com, and BigCity.com, among others.  At all times material hereto, Defendant Postfaster LLC transacted business in Arizona.

26.     Defendant Classified Solutions LTD is a Private Limited Company registered in England and Wales, which is controlled by Website Technologies, LLC and derives income from Backpage.  Defendant Classified Solutions LTD is located at 41 Chalton Street, London, England, which is the same address listed by Backpage.com LLC as its foreign address.  At all times material hereto, Defendant Classified Solutions LTD transacted business in Arizona, including through its parent company Website Technologies, LLC and its corporate relationship with Backpage.com LLC.

27.     Defendant Medalist Holdings, Inc. is owned and controlled by the same Defendants that directly or indirectly own and control Backpage, including Defendants Lacey, Larkin, Spear, and Brunst.  Defendant Medalist Holdings, Inc. is a Delaware corporation located at 8776 East Shea Boulevard, Scottsdale, Arizona.  Defendant Medalist Holdings Inc. is listed by Defendant Classified Solutions LTD as its ultimate controlling party.

28.     Defendant Larkin is the CEO of Medalist Holdings, Inc. and Defendants Lacey, Larkin, Brunst, and Spear are its shareholders.  At all times material hereto, Defendant Medalist Holdings, Inc. transacted business in Arizona, including through its subsidiary Backpage.com, LLC.

29.     Defendant Camarillo Holdings, LLC is a Delaware Limited Liability Company and a wholly owned subsidiary of Medalist Holdings, Inc. and the parent company of Defendant Backpage.com, LLC.  Defendant Camarillo Holdings, LLC was formerly known as the Village Voice Media Holdings, LLC and does business as "Backpage.com" and owned, operated, designed and controlled Backpage.  At all times material hereto, Camarillo Holdings, LLC transacted business in Arizona, including through its subsidiary Backpage.com, LLC.

30.     Defendant UGC Tech Group, C.V., is a Dutch limited partnership domiciled in Curaçao that owns all of Backpage's foreign operations.  Defendant Ferrer is the CEO of UGC Tech Group, C.V.  At all times material hereto, Defendant UGC Tech Group, C.V., transacted business in Arizona, including through its subsidiary Backpage.com, LLC.

31.     Defendant John E. Brunst is the Treasurer and an owner of Defendant Website Technologies, LLC.  Defendant Brunst is also the CFO of Medalist Holdings, Inc.  At all times material hereto, Defendant Brunst transacted business in Arizona, including through Website Technologies, LLC.

32.     Defendant Scott Spear is the Secretary and an owner of Website Technologies, LLC and is a Vice President of Backpage.com LLC.  At all times material hereto, Defendant Scott Spear transacted business in Arizona, including through Website Technologies, LLC, and Backpage.com LLC.

33.     Plaintiff Sojourner Center is an Arizona non-profit organization located in Phoenix, Arizona.  Sojourner Center is one of the largest, longest-running domestic violence shelters in the United States.  Sojourner Center provides shelter, care, and support to trafficking victims, including individuals trafficked on Backpage.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) over the claims alleging violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and conspiracy to violate RICO.  This Court has supplemental jurisdiction over Plaintiff's state law claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to Plaintiff's claims under RICO and arise from a common nucleus of operative facts, and thus form part of the same case or controversy under Article III of the United States Constitution.

35.     This Court has personal jurisdiction over Defendants because each of them knowingly committed acts in Arizona that form the basis of the action, directed or conspired with others to commit acts in Arizona, and purposely availed themselves of the privileges of doing business in Arizona as set forth herein.

36.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Sojourner Center's claims occurred in this District, including among other things, Defendants' knowing participation in and profiting from sex trafficking.

## BACKGROUND

### Backpage Knowingly Profits From Sex Trafficking

37.     In 2009, Craigslist.org, an online website that allows individuals to sell and buy personal goods and services, removed listings for "Adult Services" from its website.  As a result, online sex trafficking declined by 50%.  After Craiglist.org's exit from this market, Backpage, formerly a part of the Village Voice newspaper, changed its online advertising model to concentrate on, and quickly dominate, the market for advertising victims of sex trafficking, including underage children.

38.     Backpage cornered the market for advertisements selling sex.  In 2013, Backpage generated and collected 80% of all revenue derived from online commercial sex advertisements.  Senate Report at 6.  Backpage thus grew increasingly dependent on the sale of sex to remain a profitable company.  "Backpage's internal revenue reports show that from

January 2013 to March 2015, 99% of Backpage's worldwide income was directly attributable to the 'adult' section."  Press Release, *Attorney General Kamala D. Harris Announces Criminal Charges Against Senior Corporate Officers of Backpage.com for Profiting from Prostitution and Arrest of Carl Ferrer, CEO*, State of California Department of Justice Office of the Attorney General (Oct. 6, 2016) *available at* https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-criminal-charges-against-senior (hereinafter "California Office of Attorney General Press Release").

39.     The "Adult Services" section on Backpage has traditionally hosted numerous advertisements for trafficked adults and children.  Within the "Adult Services" section, Backpage created three subcategories of services through which it channels advertisements selling trafficked adults and children:  "escorts," "male escorts," and "body rubs."  As Defendants knew and intended, traffickers and their clientele understand that these three subcategories provide access to buying, among other things, sex with children and coerced adults.

40.     For at least the past five years, Defendants have been on notice that its websites unlawfully traffic adults and children.  On September 16, 2011, all 51 state attorneys general sent a letter to Backpage explaining their outrage "about human trafficking, especially the trafficking of minors" on Backpage.  *See* National Association of Attorneys General Letter (Sept. 16, 2011), *available at* http://www.naag.org/assets/files/pdf/signons/Backpage.com%20FINAL%209-16-11.pdf (hereinafter "NAAG Letter").  In the letter, the National Association of Attorneys General identified Backpage as a "hub" for human trafficking that "has proven particularly enticing for those seeking to sexually exploit minors."  *Id.*  The letter also requested that Backpage provide documentation of any policies or procedures implemented to prevent sex trafficking.  Backpage refused.  Senate Report at 7.

41.     Backpage officials also refused to testify at a Subcommittee hearing on January 9, 2017, and instead invoked their Fifth Amendment right against self-incrimination.  The night before the hearing, Defendants purported to shut down the "Adult Services" section of Backpage.  In reality, Defendants simply diverted the advertisements that had formerly been

placed in the "Adult Services" section to the "Dating" section of its website.  The content of the advertisements in the "Dating" section remains substantially identical to the content previously posted in "Adult Services."  As Defendants knew and intended, Backpage's traffickers and their clientele knew that the movement of the advertisements from one section to another was not intended to affect, and did not affect, their business.

### Backpage Sells Trafficked Adults And Children In Arizona

42.     Backpage provides an online marketplace for 33 locales in Arizona, including Phoenix and numerous submarkets.  All of the Arizona markets and submarkets have an "Adult Services" section and a "Dating" section.  Backpage organizes its commercial sales both by category of good or service (like "Adult Services") and by location.  Within Arizona, Backpage divides its marketplace geographically into eleven cities: Flagstaff, Mohave County (Bullhead City, Kingman, and Lake Havasu City), Phoenix, Prescott, Sedona, Show Low, Sierra Vista, Tucson, and Yuma.  Phoenix is further subdivided into four separate markets: Central/South Phoenix, East Valley, Phoenix North, and West Valley.  Since Backpage's inception, Phoenix has been one of Backpage's top 20 markets nationwide.

43.     In the course of one week in December 2016, 4,741 advertisements were posted in the "Adult Services" section in the state of Arizona.  On average, 677 advertisements were posted in the "Adult Services" section every day.

### Defendants Intentionally Do Not Report Or Remove Advertisements Trafficking Children

44.     Defendants claim that they combat sex trafficking because Backpage has a reporting feature through which users can flag an advertisement that involves a minor. However, Defendants regularly decline to escalate reports of advertisements featuring trafficked children to NCMEC or to law enforcement.  Despite being told by attorneys general and law enforcement that Defendants' websites are used for child trafficking, Backpage refused to take action to stop facilitating trafficking.  Indeed, the United States Senate reported that a Backpage internal training guide advised Backpage employees to "escalate" a report of child exploitation **only** "when users claim their underage *immediate* family member is being exploited" and "when users claim *they* are being exploited."  2017 Senate Report at 41-42.  The

guidance continued that reports of child exploitation should not be escalated if they include information that "a slightly less immediate minor relative" is being exploited, advising that a "neice [sic] nephew, grandchild, cousin, etc. doesn't count." *Id.* In these situations, Defendants instructed employees to allow the advertisement of the trafficked child to remain on the website.

45.     Backpage and Defendant Ferrer admonished Backpage employees for being overly cautious when removing advertisements of trafficked children. After a Backpage employee removed an advertisement because that employee believed the advertisement contained a trafficked child, Defendant Ferrer wrote in an email, "I see in the note for the account 'exploiting minors' who wrote this note and what is the verification? They don't look like minors to me in the pic." Appendix to 2017 Senate Report at 24. A later email from Defendant Ferrer directed a Backpage employee to "go ahead and restore the ads," meaning make them visible and live on Backpage.com. *Id.*

46.     To maximize its profits, Backpage actively provided instructions to its employees to err on the side of posting advertisements, even if they suspected that the advertisement featured children for sex:  "**IF IN DOUBT ABOUT UNDERAGE: the process for now should be to accept the ad and note the link**." Backpage instructed employees to delete the posting only if they were, "VERY SURE PERSON IS UNDERAGE." Senate Report at 20. In a similar instruction, Backpage warned its employees that, "**Young ads do not get deleted unless they are clearly a child**." 2017 Senate Report at 40.

### Backpage's Business Model Depends On Sex Trafficking To Remain Profitable

47.     From 2011 through 2015, Backpage's business model generated revenue by charging individuals for posting advertisements in the "Adult Services" section. A trafficker who wanted to post an advertisement for a girl that is "BRLY Legal" had to pay between $12.00 and $17.00 to post a single advertisement in the "Adult Services" section.

48.     The United States Senate reported that internal Backpage documents demonstrate Backpage's dependence on the "Adult Services" advertisements for revenue. For example, in May 2011, Backpage's "Adult Services" section, nationwide, featured over 700,000 paid

advertisements.  Other sections, like the "Automotive" section, featured 429 paid advertisements and the "Jobs" section featured 3,000 paid advertisements.  2017 Senate Report at 44.

49.    The number of page views for the "Adult Services" section also demonstrates Backpage's reliance on this market.  As of May 2011, advertisements in the "Jobs" section on Backpage.com had approximately 2 million page views nationally and the "Automotive" section had approximately 580,000 page views.  In May 2011, the "Adult Services" section had over one billion page views.  2017 Senate Report at 44.  Moreover, from January 2013 to October 2015, Backpage's advertisements for the "Adult Services" section increased from 169,508 per month to 2,100,602 per month.

## Backpage Writes And Edits Advertisements For Sex Trafficking

50.    Backpage creates, develops, and posts illegal content intended to sell trafficked adults and children in the "Sponsored Ads" part of the "Adult Services" section of its website.  Traffickers pay up to $1,000 to have Backpage "enhance" their advertisements by, among other things, rewriting advertisements, adding text, summarizing text, and reorganizing the content and layout of the advertisement.

51.    The "Sponsored Ads" section of Backpage appears on the right hand of the page in the "Adult Services" section of the website.  If a trafficker pays for its advertisement to be "sponsored," it submits information to Backpage and Backpage then writes and designs the text and layout of the advertisement.  Traffickers pay for this service because they know that Backpage will write an advertisement that is more likely to be clicked on and result in a transaction than an advertisement that is written by the trafficker.

52.    Backpage also decides what text to display and what text to delete from the information submitted for a sponsored advertisement.

## Backpage Closely Reviews And Edits Every Advertisement On Its Website

53.    Backpage employees reviewed every advertisement before posting it in the "Adult Services" section on the website.  Backpage employees were explicitly instructed to edit, delete, and author the content of advertisements.  Backpage directed its employees to "edit

ads for explicit sexual language," and replace such language with code terms or other phrases. For example, an email to Backpage employees stated: "Do NOT include any verbiage that has 'suck you . . .' or 'lick your. . .'  You may edit the ad to read 'I enjoy oral' but do not include the vulgar language in the ad."  Appendix to 2017 Senate Report at 2, *available at* https://www.hsgac.senate.gov/subcommittees/investigations/reports.  The purposes and effects of Defendants' rewriting of the advertisements were to make the advertisements more effective for their intended purpose and less likely to draw legal action.  Defendants' rewriting of the advertisements did not in any way change, or seek to change, the illegal trafficking of children and coerced adults; indeed Defendants' rewriting of the advertisements had the purpose and effect of increasing the effectiveness of those advertisements.

54.     One aspect of Defendants' rewriting of the content displayed on their websites was referred to internally at Backpage as its "moderation" process.  This moderation process includes "editing and deleting content *within* advertisements."  Senate Report at 11 (emphasis in original).

55.     The United States Senate found that "Backpage's moderation process operated to remove explicit references to the likely illegality of the underlying transaction—not to prevent illegal conduct from taking place on its site."  Senate Report at 21.

56.     For example, in reference to an advertisement discussing the price for sexual acts, Defendant Ferrer wrote to a Backpage employee that it was, "[b]etter to edit by removing bad text or removing bad language.  We will do this for a few weeks to give users a chance to adjust."  Senate Report at 18.

57.     Defendant Ferrer set up this moderation process to train traffickers to use certain code words when selling children for sex.  As explained by the United States Senate, "moderators were instructed to *not* remove ads for certain violations" and to instead edit them prior to publishing so that the trafficker could "adjust."  Senate Report at 17-18 (emphasis in original).  Backpage employees were instructed to "'unobtrusively' edit out problematic content while 'maintaining the essence of the ad'—and, by extension, the essence of the transaction advertised."  Senate Report at 18.

### Backpage Created Automatic Filters To Knowingly Conceal Child Trafficking

58.    Backpage does more than manually edit the advertisements that illegally traffic adults and children.  Backpage also created automatic filter programs that changed the words used in advertisements.   For example, the United States Senate reported that Backpage automatically deletes the following terms from any advertisement: "lolita," "teenage," "rape," "amber alert," "little girl," "teen," "fresh," "innocent," and "school girl."  2017 Senate Report at 2.  One of these programs was called the "Strip Term From Ad" filter.

59.    The United State Senate explained that while "the Strip Term From Ad filter changed nothing about the true nature of the advertised transaction or the real age for the person being sold for sex, thanks to the filter, Backpage's adult ads ***looked***" in the words of Backpage employees "cleaner than ever." *Id.* (emphasis added).

60.    The United States Senate also found that Defendant Ferrer "personally directed or approved the addition of new words to the Strip Term From Ad Filter and Backpage documents clearly show he understood their implications for child exploitation," including words like "lolita."  2017 Senate Report at 24.  According to Defendant Ferrer, "lolita" is "code for under aged girl[s]."  2017 Senate Report at 24.

### Backpage Teaches Traffickers How To Evade Law Enforcement

61.    Backpage designed its website to include an interactive process to help traffickers draft unsponsored advertisements for the "Adult Services" section.  Through this process, Backpage takes an active role in creating the content of even the advertisements it does not sponsor.  This website feature educates traffickers on the best terms to use to attract the attention of a prospective buyer while also ensuring that the trafficker will not be identified or apprehended by law enforcement and that Backpage will not be implicated.

62.    Traffickers are coached to use code words such as "high schl" and "brly legal" rather than words that would explicitly state that a child being trafficked is under 18.  As Defendants knew and intended, traffickers and their clientele understood that "high schl" and "brly legal" were code words for a child under 18.

63.     The United States Senate investigated these coaching practices and found that Backpage's claim that its filters "actively prohibit and combat illegal content" was false. Instead, Backpage "guided its users on how to easily circumvent those measures and post 'clean' ads." 2017 Senate Report at 34. Defendant Ferrer directed his employees to ensure that any banned term resulted in an error message to "help" the traffickers learn the coded language necessary for posting advertisements selling trafficked children for sex. *Id.*

64.     The Senate Report explained that "at Ferrer's instruction, when a user attempted to post ads with even the most egregious banned words, the user would receive an error message identifying the problematic word choice. For example, in 2012, a user advertising sex with a 'teen' would get the error message: 'Sorry, 'teen' is a banned term.' Through simply redrafting the ad, the user would be permitted to post a sanitized offer." 2017 Senate Report at 34-35.

65.     Backpage also provides a "filter" for traffickers who attempt to advertise that the child being sold is under 18 years of age. As mentioned above, Backpage requires that the person posting an advertisement provide the age of the "ad poster." When a trafficker attempts to input an age for the person in the advertisement that is lower than 18, Backpage provides the following error: "Oops! Sorry, the ad poster must be over 18 years of age." Backpage does not flag the ad, block the poster, or alert the authorities. Rather, Backpage allows traffickers to input a different age for the same person in the same advertisement repeatedly—with absolutely no form of age verification—until the trafficker inputs an age of 18 or older.

66.     Backpage's "filter" is nothing more than a coaching mechanism intentionally designed by Backpage to facilitate and profit from sex trafficking. It certainly does not, as Backpage claims, prevent child trafficking—nor did Backpage ever intend for it to do so.

67.     Defendant Ferrer directly participated in this coaching process, communicating with individuals attempting to post advertisements for illegal commercial sex on Backpage. For example, in June 2009, Defendant Ferrer wrote to an individual attempting to post an advertisement on Backpage: "Could you please clean up the language of your ads before our abuse team removes the posting?" Appendix to 2017 Senate Report at 4. Also in June 2009,

Defendant Ferrer instructed an individual attempting to post on Backpage to remove the "sex act pics" before posting in the future to avoid having the advertisement removed.  *Id.* at 187.

68.     Defendant Ferrer explained that Backpage needed to implement a more "consumer friendly" approach that directed moderators to "remove bad content in the post," allowing moderators to be "subjective and not cause too much damage."  2017 Senate Report at 21.  Defendant Ferrer favored this approach because it did not harm "the user financially."  *Id.*

69.     The United States Senate reported that Backpage and Defendant Ferrer's "direct contact with users—much like the automatic filtering process—was also successful in helping users post 'clean' content despite the illegality of the underlying transaction."  2017 Senate Report at 35.  Defendants understood that this was the effect of their coaching mechanism.  A December 2010 email from Backpage employees to Defendant Ferrer reported that roughly "75% of the users we contact are converted to compliant."  Appendix to 2017 Senate Report at 187.

**Backpage Profits By Simultaneously Increasing Supply And Demand for Traffickers**

70.     In 2015, all three major U.S. credit card companies (MasterCard, American Express, and Visa) collectively refused to do any further business with Backpage because Backpage profited from the sale of trafficked children for sex.  In announcing its decision, MasterCard stated that "it has rules that prohibit our cards from being used for illegal or brand-damaging activities.  When the activity is confirmed, we work with the merchant's bank to resolve the situation."  Similarly, Visa stated that its "rules prohibit our network from being used for illegal activity."

71.     After the credit card companies refused to deal with Backpage, Backpage adopted a number of approaches to permit Defendants to continue to collect increasingly large revenues from sex trafficking.  These approaches included the use of Bitcoins and, as described below, the use of Defendants' Postfaster LLC to launder payments from Backpage's sex trafficking customers.  After the credit card companies blacklisted Backpage, Backpage offered postings for advertisements in the "Adult Services" section for free.  Nevertheless, its income continued to grow as Backpage continued to charge traffickers to "enhance" their advertisements in the

"Adult Services" section.  Advertisement enhancements allow traffickers to position their advertisements above the others listed in the same section.  Essentially, this allows traffickers to ensure that potential purchasers of illegal sexual acts see their advertisement first.

72.     For example, in Phoenix, traffickers pay $5.00 to move a listing to the top of the webpage for an hour or $120.00 to move a listing to the top of the webpage for 24 hours.  Traffickers can also ensure that their advertisements automatically repost for a certain number of days for an additional fee of between $20.00 and $480.00.

73.     The most important enhancement offered by Backpage to traffickers is also the most harmful to trafficking victims:  For anywhere from $1.00 to $15.00, Backpage allows traffickers to post an advertisement in multiple locations simultaneously.  Thus, Backpage makes it possible for traffickers to sell adults and children for sex in multiple cities at the same time.  For example, for a $15.00 fee, an advertisement will appear in all four regions of Phoenix: Central/South Phoenix, East Valley, Phoenix North, and West Valley.

74.     By allowing traffickers to cross-post in several locales, traffickers can move from market to market more easily, selling the same adults and children for sex in multiple cities and states.  As a result, Backpage has increased both the frequency and success of sex trafficking.

75.     Defendants intentionally designed the website in this manner because Defendants know that their success is directly correlated to, and dependent upon, the success of sex trafficking.  As a result of Backpage's actions, trafficking victims regularly report being sold in multiple states in a single day or week.  The United States Senate explained that because of Backpage, "traffickers can maximize profits, evade law enforcement detection, and maintain control of victims by transporting them quickly within and between states."  2017 Senate Report at 5.

**Backpage Designed Its Website In Bad Faith To Help Traffickers Evade Prosecution**

76.     Because Backpage's profitability and survival depends on sex trafficking, it has created tools, in bad faith, to ensure that traffickers are not identified and apprehended by law enforcement.

77.     Before all three major credit card companies refused to transact business with Backpage, Backpage enabled traffickers to pay for advertisements in a covert manner by permitting the use of prepaid credit cards that did not need to be linked to a name, address, or any other identifying information.

78.     After Backpage was forced to stop charging for posting an advertisement in the "Adult Services" section, Backpage emphasized its other anonymous payment options so that traffickers could pay to post their advertisements using the digital currency Bitcoin.  Because Bitcoin is not linked to a bank and is largely untraceable, it allows traffickers to pay for advertisement enhancements without leaving any evidence of their identity.

79.     When a trafficker posts an advertisement in the "Adult Services" section, he automatically receives certain privacy protection and identity-blocking features that Backpage does not provide for an individual posting in any other section on its website.

80.     For example, the Backpage website processes any photograph posted as part of an advertisement in the "Adult Services" section and automatically strips it of all metadata, including, but not limited to, the method used to capture the photograph, exposure setting, capture time, GPS location information, and the camera model.  This data, which resides within the photograph, would provide law enforcement with crucial information to locate the trafficked child and apprehend the trafficker.  Backpage deliberately pays an additional fee for these software adjustments to ensure that the photographs posted in the "Adult Services" section are stripped of metadata and cannot be used to identify and track sex traffickers.

81.     Defendants also allow traffickers to evade law enforcement by allowing traffickers to post their phone numbers by spelling out the digits of their telephone numbers instead of using Arabic numbers.  For example, the numerals "414" can be written as "four-1-four."  Such listings make it more difficult for law enforcement to scan ads, identify traffickers, and conduct sting operations to rescue children by scanning the Internet for certain phone numbers.

82.     Defendants designed the Backpage website so that sex traffickers would not have to verify the phone numbers they post in connection with an advertisement for a trafficked child

or adult.  Backpage possesses the software and technology to require telephone number verification before posting an advertisement—in fact, it requires this form of verification for other sections of its website.

83.     In effect, Backpage makes it harder for someone to sell a dog or cat in its "Pets" section than it does for someone to sell an adult or child for sex in the "Adult Services" or "Dating" sections:   Anyone trying to sell a dog or cat through "Pets" must verify their telephone number, while anyone trying to sell an adult or child for sex through "Adult Services" or "Dating" does not.

84.     Backpage understands that the telephone verification process would create an additional record and evidentiary trail of the trafficker, potentially dissuading the trafficker from using Backpage.  Defendants therefore intentionally omitted this feature from the "Adults Services" section to make it easier for traffickers to evade law enforcement when they pay to post their advertisements of children and coerced adults.

**Backpage Moved Its Advertisements For Sexual Services To The Website's Dating Section**

85.     On January 9, 2017, the United States Senate released a report titled "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  2017 Senate Report.  The 2017 Senate Report was the culmination of a 20-month investigation into Backpage.  After reviewing over one billion pages of documents, the United States Senate Report identified three principal findings:  "First, Backpage has knowingly concealed evidence of criminality by systematically editing its 'adult' ads."  2017 Senate Report at 2.  "Second, Backpage knows that it facilitates prostitution and child sex trafficking."  *Id.* at 3.  "Third, despite the reported sale of Backpage to an undisclosed foreign company in 2014, the true beneficial owners of the company are James Larkin, Michael Lacey, and Carl Ferrer."  *Id.*

86.     The 2017 Senate Report was released the same day the Subcommittee held a public hearing to investigate Backpage and online trafficking.  All Backpage officials called to testify, including Defendants Ferrer, Lacey, and Larkin, invoked their Fifth Amendment right against self-incrimination and refused to provide any information to the Subcommittee.

87.     To divert attention from the 2017 Senate Report and their unwillingness to cooperate with the Subcommittee's investigation, Backpage removed the "Adult Services" section from its website on the evening before the January 9 hearing.  In its place, Backpage inserted a webpage that included, among other things, a notification that "the government has unconstitutionally censored this content."

88.     Despite this publicity stunt and Backpage's claims to the contrary, however, trafficked adults and children are still being advertised and sold on Backpage.  Backpage did not actually remove its advertisements for sex, including advertisements for trafficked adults and children.  Instead, it simply shifted all of these advertisements to the "Dating" section of its website.

89.     Defendants have explicitly instructed Backpage employees to hide their actions of creating content in order to ensure that courts would not understand that Defendants create content and author advertisements.  The United States Senate reported that on July 28, 2011, Defendant Larkin wrote to Defendant Ferrer "cautioning him against Backpage's moderation practices 'being made public.  We need to stay away from the very idea of 'editing' the posts, as you know.'"  2017 Senate Report at 17.  Now that Defendants' role as a content creator **has** been "made public," however, they are subject to liability for their actions.

### Defendants Design The Content Of EvilEmpire
### And BigCity Advertisements To Further Trafficking

90.     Defendant EvilEmpire.com ("EvilEmpire") is owned and operated by Defendants Ferrer, Lacey, and Larkin.  EvilEmpire is a website that exclusively features advertisements for "adult services," including advertisements for trafficked adults and children.  Defendants provide all of the content hosted, published, and featured on EvilEmpire.  Defendants exclusively create, maintain, and control the content posted on EvilEmpire.  Third parties are unable to post on EvilEmpire directly.

91.     EvilEmpire's homepage consists of a grid of pictures of naked or nearly naked individuals in erotic poses, each with a phone number and a city and state below the picture.  Clicking on one of these advertisements redirects the purchaser to the full advertisement

initially posted on Backpage.  Some of these advertisements also feature a link for the same advertisement posted on Defendant BigCity.com ("BigCity").

92.     EvilEmpire organizes and reposts advertisements posted on Backpage. EvilEmpire aggregates all advertisements that use a certain phone number on a single webpage on EvilEmpire.  That is, Evil Empire is a sex trafficker catalogue.  It creates a webpage for each trafficker, identified and sorted by his phone number, in which all of the trafficked adults and children controlled by that trafficker are featured for purchase.  Often the same trafficked child will be featured in different advertisements that identify the trafficked child as being different ages and having different names, all on the same webpage.  A cursory view of such a webpage makes it clear to anyone that the advertisements for the trafficked child include false ages, as the same child is associated with multiple ages over 18.

93.     Defendants thus knowingly conspired with traffickers to make trafficking children and coerced adults more efficient by creating webpages on EvilEmpire that catalogue traffickers' advertisements.  Defendants also knowingly conspired with traffickers to falsely represent that a trafficked child was over 18, as made clear by the multiple age representations for the same individual in multiple advertisements collected on the single webpage.

94.     Defendants organized BigCity in a similar manner to EvilEmpire to increase the efficiency and demand for traffickers.  BigCity is a website that exclusively features advertisements for adult services.  Defendants Lacey, Larkin, and Ferrer own and operate BigCity.  BigCity's homepage is comprised of a grid of stitched together pictures of naked or nearly naked individuals in erotic poses; each picture is a link to that trafficked adult or child's "Profile."  The "Profile" is a webpage that contains pictures of an individual, and that individual's name, age, phone number, and location.  While EvilEmpire organizes advertisements based on the trafficker posting them, BigCity organizes advertisements based on the trafficked adult or child featured in the advertisement.

95.     Like EvilEmpire, historically, Defendants exclusively created, maintained, and controlled the content that was posted on BigCity, taking advertisements from Backpage and reposting them on BigCity.  Although there is now a feature on BigCity that allows users to

post new content and create a "Profile" for themselves, Defendants continue to create the majority of the profiles on BigCity by taking content posted on Backpage.

96.     Defendants intentionally cross-post advertisements on Backpage, BigCity, and EvilEmpire.  Defendants knew well that by cross-posting they were granting traffickers greater access to those who would buy an adult or child for sex.  Indeed, thanks to the cross-posting it became faster, cheaper, and more convenient for the traffickers to sell others for sex.  Thus, with Defendants' knowing and intentional aid, it became easier than ever for traffickers to turn a profit by selling the bodies of adults and children.

### Defendants Conspire With Traffickers To Sell
### Children For Sex On EvilEmpire And BigCity

97.     Defendants also conspire with traffickers to falsely represent and hide the fact that they are selling trafficked children.  The aggregation features on BigCity and EvilEmpire make it clear that Defendants know that they are conspiring with traffickers to falsely represent the age of trafficked children.  For example, sometimes the age of a trafficked boy advertised on EvilEmpire is different from the age of the boy as advertised on Backpage, despite having the same phone number and pictures.  Similarly, sometimes the girl advertised on BigCity is older than the girl advertised on Backpage, despite having the same phone number and pictures. And often, the age of the same child is listed multiple times as different ages within advertisements on a single webpage for BigCity.

98.     Defendants also enable their trafficker co-conspirators to evade law enforcement by stripping metadata from the photographs that are posted to EvilEmpire and BigCity. Stripping the metadata from these photographs prevents law enforcement or family members of the trafficked child from searching Google for the same image or photograph posted on EvilEmpire or BigCity.  Such Google image searches allow law enforcement to locate the trafficked child more easily and quickly by cross-referencing their different locations. EvilEmpire and BigCity were intentionally designed by Defendants to help traffickers posting on Backpage to increase their exposure to potential purchasers without also increasing their exposure to law enforcement.

99.     In 2015, when credit card companies began refusing to process payments for services to Backpage, Defendants created a web of entities deliberately designed to conceal the transfer of funds from other entities belonging to Defendants to Backpage.  For example, Defendants created Defendant Postfaster.com, LLC, to operate a website that did not contain an "Adult Services" section.

100.    Defendants directed traffickers attempting to purchase advertisements on Backpage to purchase credits from Postfaster.com to use to buy advertisements on Backpage. Defendants then falsely represented to payment processors that Postfaster.com had no affiliation with Backpage so that payment processors would transact with them despite the credit card ban.

101.    Defendants deny their affiliation with Backpage, EvilEmpire, and BigCity to make it more difficult for a trafficked adult or child, or their family members, to remove their photographs.  For example, when a trafficked child contacted Backpage and requested that Backpage remove her picture from EvilEmpire, Defendants falsely replied that Backpage was not affiliated with EvilEmpire and could not remove her picture.

102.    Backpage instructed its employees to stop reporting advertisements posted on EvilEmpire that displayed pictures of trafficked children for sex.  A Backpage employee emailed the following instruction to another Backpage employee:  "Hey do you guys normally send out evil empire and naked city links when you reply to cops?  If you do, can you stop? We own those sites too ☺."  Appendix to 2017 Senate Report at 406.

**Defendants Intentionally Structured Their Corporations To Obscure Ownership, Evade Law Enforcement, And Launder Profits**

103.    In 2014, Defendants sold Backpage to a Dutch corporation to conceal its ownership structure.  Prior to this sale, Defendants had created an elaborate corporate structure with multiple shell corporations to launder money, obscure actual ownership, and evade law enforcement.

104.    Defendants created Defendants Medalist Holdings, Inc. (and a related entity, Medalist Holdings LLC) and Website Technologies, LLC to obscure the ownership structure of

Backpage.com LLC and its affiliates.  The United States Senate reported that Defendant Medalist Holdings LLC was "Backpage.com's ultimate corporate parent—five layers removed," and that Backpage.com LLC "had a service agreement with another of Medalist Holding LLC's ultimate subsidiaries, Website Technologies LLC, under which Website Technologies, LLC, performed most of Backpage's outward-facing operations through an arm-length business contract."  2017 Senate Report at 45.

105.     Prior to its sale, Backpage's ownership structure was already complex and layered:



*Id.* at 46.

106.     On December 29, 2014, Defendant Medalist Holdings LLC "entered into a Letter of Intent for the sale of Backpage for $600 million to a Dutch corporation."  *Id*.  As the United

States Senate found, "Backpage has long sought to obscure the identity of the purchaser" and failed to disclose the identity of the purchaser in regulatory filings in the European Union.  *Id.*

107.    The actual purchaser, however, was Defendant and Backpage CEO, Carl Ferrer. The United States Senate explained that:

> The December 2014 Letter of Intent listed the buyer as UGC Tech Group C.V., a Dutch company domiciled in Curacao and headed by Ferrer, and the seller as the intermediate holding company Camarillo Holdings, a Delaware-based limited liability company.  The transaction was styled as a sale of the membership interests in Dartmoor Holdings, another holding company that owned Backpage.com, as well as Website Technologies.  The signatories on the Letter of Intent were Brunst, named as "CFO" of Camarillo Holdings, and Ferrer, acting as "Director" of UGC Tech Group C.V.  The sale was to be financed with a five-year loan at 7% interest from the seller to the buyer for the full amount of the $600 million purchase price.

*Id.* at 47.

108.    The United States Senate reported that this transfer did not occur at an arm's length, as Backpage claimed, but instead was an intra-corporate transfer that served no valid business purpose:

> Rather, Lacey and Larkin loaned Ferrer, as Backpage CEO, hundreds of millions of dollars in an entirely seller-financed employee buyout.  Under the Letter of Intent, moreover, Lacey and Larkin retain significant financial and operational control over Backpage.  The pair, for example, are entitled to amortized loan repayments earn-outs on future profits, and a 30% participation in any future sale of the company in excess of the purchase price.  And they retained a security interest over all Backpage assets, all membership and stock interests in Backpage, and all Backpage bank accounts.

*Id.*

109.    The United States Senate Report found that this ownership transfer was structured to obscure the ownership of Backpage and make it look like ownership was transferred to a Dutch corporation when, in fact, Defendants Lacey and Larkin retained ownership of and control over Backpage:

> The Letter of Intent subjects Ferrer to significant restrictions on his management of the company until the loan is repaid.  He cannot sell Backpage,

assign the loan to another borrower, or even change accountants or outside counsel without approval from even Lacey and Larkin. The sale was conditional on Ferrer providing a five-year business plan satisfactory to Seller in its sole and absolute discretion and Ferrer also committed to submit Lacey and Larkin for approval an annual budget, monthly and quarterly balance sheets, and annual audited financial statements. Ferrer also made covenants to give Lacey and Larkin electronic access to Backpage's bank accounts and full access to its books and records. In addition, Ferrer could not without approval change the company's organizational structure, salaries, banking relationships, or place of domicile. Moreover, according to a loan agreement later executed in connection with the sale, Ferrer could not engage in any line of business other than the business engaged in on the date of the sale.

*Id.* at 48 (internal quotations and citations omitted).

110.     Defendant Ferrer further created two entities to serve as the direct buyers of Backpage's domestic and foreign operations, respectively Defendants Atlantische Bedrijven C.V. (which purchased Backpage's U.S. operations) and UGC Tech Group C.V. Defendant Atlantische Bedrijven C.V. is a Dutch limited partnership domiciled in Curacao and ultimately owned and controlled by Defendant Ferrer through Delaware-based Defendants, Amstel River Holdings and Kickapoo River Investments. *Id.* at 49.

111.     Defendant Atlantiche Bedrijven purchased Backpage's domestic operations for $526 million by purchasing the assets of Defendant Dartmoor Holdings LLC from Delaware based Vermillion Holdings LLC, which also loaned it the money for its purchase, rendering Atlantische Bedrijven owner of Backpage and Website Technologies. *Id.* at 49.

112.     The United States Senate reported that Backpage's own tax lawyer explained that this "unusual structure—involving multiple layers of holding companies, both domestic and foreign—provided no tax benefit to Backpage." *Id.* at 49. Moreover, "all profits within this corporate structure flow up to the U.S.-based Amstel River Holdings (which is 100% owned by Ferrer) for tax purposes." *Id.* The Senate also identified an email from Defendant Brunst confirming that Atlantische Bedrijven is "subject to U.S. tax on its earnings" and serves "merely as a pass through entity owned indirectly by Carl Ferrer." *Id.* at 49-50 (internal quotations omitted).

113.     In sum, the United States Senate found that:

despite the reported sale of Backpage to an undisclosed foreign company in 2014, the true beneficial owners of the company are James Larkin, Michael Lacey, and Carl Ferrer.  Acting through a complex chain of domestic and international shell companies, Lacey and Larkin lent Ferrer over $600 million to purchase Backpage from them.  But as a result of this deal, Lacey and Larkin retain significant financial and operational control, hold almost complete debt equity in the company, and still receive large distributions of company profits.  According to the consultant that structured the deal, moreover, this transaction appears to provide no tax benefits.  Instead, it serves only to obscure Ferrer's U.S.-based ownership and conceal Lacey and Larkin's continued beneficial ownership.

*Id.* at 3.

## **Backpage Has Harmed Sojourner Center**

114.     Plaintiff Sojourner Center provides emergency shelter, transitional housing, and other services to people that have been affected by domestic violence and human trafficking. Sojourner Center cares for and provides shelter to individuals who were trafficked on Backpage.  Sojourner Center also hosts the SAFE Action Project, which provides education and training on human trafficking to the tourism industry.  This initiative was developed as a response to the increased number of trafficked individuals seeking support, services, and shelter from the Sojourner Center.

115.     In 2016, Sojourner Center saw, treated, and cared for 42 trafficked individuals. Sojourner Center has provided actual shelter, counseling, and support to at least 15 young women and girls who were trafficked on Backpage.  One of these women came to Sojourner Center at 19 years of age, having been trafficked, sold, and raped in four different states since she was a young teenager.  Each of her traffickers used Backpage to connect her with the trafficker's customers.

116.     Sojourner Center's overall mission is to provide a "continuum of multicultural services to individuals and families impacted by domestic violence in Arizona, while collaborating with the global community on education, research and advocacy to end domestic violence."  Its vision is to create a "world free from domestic violence."  The increase in sex

trafficking has frustrated this mission, including by requiring Sojourner Center to divert scarce resources from its mission to caring for trafficking victims.

117.    Sojourner Center has provided services to thousands of trafficking victims who often also seek shelter and aid at the Sojourner Center.  While Sojourner Center is primarily focused on domestic violence victims, it welcomes human trafficking victims and provides them shelter, services, and support.  In order to properly serve these trafficked victims, Sojourner Center had to perform a holistic assessment of its organization to identify the adjustments to its services and training necessary to better support and care for trafficking victims as compared to victims of domestic violence.

118.    Sojourner Center has thus expanded its resources to combat human trafficking and agreed to run the SAFE Action Project, a program focused on educating the community about human trafficking.  This project required developing training materials, training staff, and hiring an additional staff member to run the project.  Sojourner Center also hired an additional staff member to perform intake interviews of trafficking victims and educate trafficking victims to avoid future exploitation.

119.    Further, Sojourner Center had to provide training classes to its staff to learn to work with and better serve trafficked individuals.  Because trafficked individuals seeking shelter at the Sojourner Center arrive with higher levels of trauma and more urgent needs than domestic violence victims, Sojourner Center had to devote a significant amount of staff time to properly caring for trafficked individuals upon arrival.

120.    As a result of providing these and other services, Sojourner Center diverted and drained its resources, and its mission was frustrated because it would otherwise have invested these resources in providing additional shelter and care to domestic violence victims and to ending domestic violence.

### Defendants' RICO Conspiracy Involves Multiple Predicate Acts That Have Harmed And Continue To Harm Sojourner Center

121.    Sojourner Center provided support, care, and services to 42 trafficking victims in 2016 alone.  At least 15 of these trafficking victims were trafficked on Backpage.

122.     Sojourner Center's client Jane Doe 1 was trafficked on Backpage from 2010 through early 2016, during which she was age 13 through 19.  Jane Doe 1 was trafficked in three states, including Arizona, California, and Utah.  Multiple traffickers posted her picture on Backpage.  She sought support and services from Sojourner Center beginning in early 2016, at the age of 19, and stayed at Sojourner Center for eight weeks.

123.     Sojourner Center's client Jane Doe 2 was trafficked on Backpage from early 2014 through spring 2016, during which she was age 17 through 19.  She sought support and services from Sojourner Center beginning in spring 2016, at the age of 19, and stayed at Sojourner Center for three weeks.

124.     Sojourner Center's client Jane Doe 3 was trafficked on Backpage as an adult from the fall 2014 through fall 2016.  She sought support and care from Sojourner Center beginning in fall 2016, at the age of 26.  She stayed at Sojourner Center for more than three months.

125.     Sojourner Center's client John Doe 1 was trafficked on Backpage as a child for at least two years.  He stayed at Sojourner Center for 30 days beginning in fall 2016.

126.     Sojourner Center's clients Jane Does 4-7 were trafficked on Backpage as adults.  They each sought support and care from Sojourner Center beginning in spring 2016, and each stayed at Sojourner Center for 120 days.

127.     Defendants' RICO conspiracy and pattern of predicate acts has increased the prevalence and frequency of sex trafficking and has increased the amount of resources Plaintiff must expend to provide care and support to trafficking victims.

128.     Defendants' RICO conspiracy has also enabled the traffickers and Defendants to evade law enforcement, which has allowed trafficking to continue and increased the amount of resources that Plaintiff must expend in its attempt to end sex trafficking in Arizona and nationwide.

### Defendants' RICO Co-Conspirators

129.     From November 2011 to in or about December 2012, co-conspirator Jermaine Lamon Roy used Backpage.com to traffic a learning-disabled victim by force, repeatedly beating and assaulting her and, at least once, taking her to a remote location and threatening to

1   murder her if she did not continue to engage in sex work for him.  The victim had difficulty

2   reading, writing, and understanding complex concepts, and had previously received disability

3   benefits due to her condition.  Roy was subsequently convicted of one count of sex trafficking

4   by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a).

5          130.    In February 2012, co-conspirator Michael Williams held a minor against her will

6   and listed her for sex on Backpage.com, posting pictures of her in revealing clothing for these

7   advertisements and threatening her with beatings if she attempted to see or contact her family.

8   On multiple occasions over the course of one week, the minor was forced to perform sexual

9   acts on unidentified buyers responding to advertisements posted on Backpage.  Eventually,

10  police raided the motel where the minor was being held, rescuing her and subsequently

11  arresting Williams.  On August 7, 2015, Williams pleaded guilty to one count of sex

12  trafficking, in violation of 18 U.S.C. § 1591.

13         131.    In 2010, co-conspirator Shacon Barbee used Backpage to sell a minor girl, whom

14  he first encountered when she was 13 years old, for sexual services.  Barbee also forced her to

15  recruit other girls who were subsequently also sold for sex on Backpage.  Barbee was arrested

16  and subsequently convicted of two counts of Promoting Commercial Sexual Abuse of a minor,

17  in violation of Wash. Rev. Code Ann. § 9.68A.101.

18         132.    Beginning in December 2011 and continuing through January 2012, co-

19  conspirators Calvin Winbush and Sonora Armstrong recruited a homeless 15-year-old girl,

20  promising her support before advertising her for sexual services on Backpage.  Winbush and

21  Armstrong then transported the minor from Ohio to Virginia, where she was coerced into

22  performing sexual acts on clients responding to these Backpage advertisements.  Winbush and

23  Armstrong each subsequently pleaded guilty to one count of conspiracy to transport a minor

24  interstate for the purposes of prostitution, in violation of 18 U.S.C § 2423(e), and Winbush also

25  pleaded guilty of transporting a minor interstate for the purposes of prostitution, in violation of

26  18 U.S.C § 2423(a).

27

28

133.     The unnamed traffickers responsible for trafficking Sojourner Center's clients, Jane Doe 1-7 and John Doe 1, on Backpage, identified in paragraphs 123 through 127 above, also constitute Defendants' co-conspirators in the RICO conspiracy.

**Defendants' RICO Conspiracy Violated Multiple Federal Laws**

134.     Defendants and their trafficker co-conspirators have created an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).  Defendants have used this enterprise to launder money, evade law enforcement, obscure the ownership of Backpage, and conspire with traffickers to profit from the trafficking of coerced adults and children.  The efficiencies of the association-in-fact enterprise have been identified above in paragraphs 90 through 113 above.  For example, Defendants Ferrer, Lacey, and Larkin use profit illegitimately gained from Backpage to invest in EvilEmpire and BigCity, which increases both the supply and demand of the trafficking market for Defendants and their trafficker co-conspirators.  Similarly, Defendants used Postfaster.com to launder money illegitimately gained for posting advertisements on Backpage.  The multiple Defendant shell corporations identified in paragraphs 103 through 113 were used to obscure ownership, launder money, and evade law enforcement.  The predicate acts committed by this association-in-fact enterprise are identified below.

i.     18 U.S.C. § 1591 (Sex Trafficking)

135.     Defendants' and their co-conspirators' conduct "enticed" or "solicited" commercial sex acts, both involving persons under 18 and involving persons (including persons under 18) subject to "force, threats of force, fraud, and coercion."  Defendants knowingly advertised, and financially benefitted from, ventures that they knew (a) involved a person under 18 years of age engaging in "commercial sex acts" and (b) involved persons (including under the age of 18) engaging in "commercial sex acts" as the result of force, threats of force, fraud, and coercion.  These predicate acts violated 18 U.S.C. § 1591.

ii.     18 U.S.C. § 2251 (Sexual Exploitation of Children)

136.     Defendants knowingly published, or caused to be published, advertisements seeking or offering to receive, exchange, buy, produce, display, distribute, or reproduce visual

depictions involving the use of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2251.

137.   Defendants knowingly published, and caused to be published, advertisements seeking or offering participation in acts of sexually explicit conduct by or with a minor for the purpose of producing a visual depiction of such conduct in violation of 18 U.S.C. § 2251.

138.   Defendants knew, and had reason to know, that the advertisements so published were and would be transported using means and facilities of interstate and foreign commerce, including by computer and mail, in violation of 18 U.S.C. § 2251.

iii.   18 U.S.C. § 2252 (Material Involving the Sexual Exploitation of Minors)

139.   Defendants knowingly transport the images on its websites in interstate and foreign commerce in violation of 18 U.S.C. § 2252.

140.   As Defendants know, the production of many of those images involves the use of a minor engaging in sexually explicit conduct and those images visually depict such conduct, in violation of 18 U.S.C. § 2252.

iv.   18 U.S.C. § 2422 (Coercion and Enticement)

141.   Defendants know and intend that the advertisements they create and publish will persuade, induce, and entice individuals to travel in interstate and foreign commerce, and in territories and possessions of the United States (including Puerto Rico) to engage in prostitution, in violation of 18 U.S.C. § 2422.

142.   Defendants' websites are a facility and means of interstate and foreign commerce. Defendants knowingly create and publish content on their websites that has the purpose and effect of inducing, enticing, and coercing girls under 18 depicted in such content to engage in prostitution, in violation of 18 U.S.C. § 2422.

v.   18 U.S.C. § 1956 (Laundering of Monetary Instruments)

143.   Defendants conducted, and attempted to conduct, financial transactions involving money and property known to Defendants to be the proceeds of unlawful activity as described herein, with the intent to promote the carrying on of that unlawful activity.  Defendants also conducted and attempted to conduct financial transactions involving money and property

1    known to Defendants to be the proceeds of unlawful activity, with the intent to engage in

2    conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986.

3        144.    Defendants conducted and/or attempted to conduct financial transactions

4    involving money and property known to Defendants to be the proceeds of unlawful activity as

5    described herein, knowing that the transaction was designed to conceal or disguise the nature,

6    location, source, ownership, or control of the proceeds of such unlawful activity, and/or to

7    avoid a transaction reporting requirement under state or federal law.

8        145.    Defendants made numerous financial transactions in which Defendants received

9    funds directly or indirectly from Defendants' co-conspirator pimps for advertising and

10   promoting commercial sex acts, including commercial sex acts that Defendants knew would be

11   performed by minors and by persons (including children) performing such commercial sex acts

12   as the result of force, threats of force, fraud, and coercion.

13       146.    Defendants knew that the funds so received by them had been derived from

14   unlawful activity, including commercial sex acts performed by minors and by persons

15   performing such commercial sex acts as the result of force, threats of force, fraud, and coercion,

16   all in violation of state and federal criminal law, including 18 U.S.C. § 1591 (sex trafficking of

17   children or by force, fraud, or coercion); 18 U.S.C. § 2251 (sexual exploitation of children);

18   18 U.S.C. § 2252 (certain activities relating to material involving the sexual exploitation of

19   minors); 18 U.S.C. § 2422 (coercion and entertainment); and 18 U.S.C. § 2423 (transportation

20   of minors).

21       147.    Defendants conducted or attempted to conduct such financial transactions

22   knowing that the transactions were designed in whole or in part to conceal or disguise the

23   nature, the location, the source, the ownership, or the control of the proceeds of foregoing

24   unlawful activity, and with the purpose and effect of doing so in violation of 18 U.S.C. § 1956.

25       / / /

26       / / /

27       / / /

28

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**(VIOLATIONS OF RICO 18 U.S.C. § 1962(c))**

*Against All Defendants*

148.     Plaintiff repeats and realleges paragraphs 1 through 147 as if fully set forth herein.

149.     From 2009 to the present, Defendants and their co-conspirators (named and unnamed) have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Sex Trafficking Enterprise").

150.     The Sex Trafficking Enterprise was engaged in, and the activities of the Sex Trafficking Enterprise affected, interstate and foreign commerce.  Defendants' websites and their affiliates have content containing advertisements for commercial sex in all 50 states, Puerto Rico, Washington D.C., Canada, Mexico, and in most of the countries in Europe, South America, and Asia.

151.     Defendants agreed to and did conduct and participate in the conduct of the Sex Trafficking Enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally profiting from and promoting the sex trafficking of children on their websites, and of laundering of money in order to conceal the nature, origin, and destination of the illegal transactions.

152.     Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Sex Trafficking Enterprise through a pattern of racketeering activity consisting of the following predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(b):

    a.     Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by forming multiple shell corporations to conceal funds and obscure ownership of Defendant Backpage.

    b.     Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transferring funds and ownership in 2014 to Defendant Atlantische Bedrijven for the sole purposes of transferring illegitimate

funds and obscuring ownership of the company by Defendants Ferrer, Lacey, and Larkin.

c.    Defendants further engaged, and conspired to engage, in money laundering by falsely representing that certain Defendant companies, including Postfaster.com and Postfaster.com LLC, had no affiliation with Defendant Backpage so that credit processors would process the funds Backpage illegitimately received. Defendants then transferred these funds back to Backpage in further violation of 18 U.S.C. § 1956.

d.    Defendants engaged, and conspired to engage, in sex trafficking and the trafficking of children in violation of 18 U.S.C. § 1591.

e.    Defendants created and maintained advertisements for commercial sex acts to be performed by minors on their websites; created and maintained entities to continue to profit from unlawful activity with the intent of continuing that unlawful activity; created, maintained, and provided content for websites whose purpose was to further promote and profit from the Sex Trafficking Enterprise while deterring law enforcement; and encouraged and enticed exploitation of minors.  Pursuant to and in furtherance of their unlawful scheme, Defendants committed multiple related acts of sex trafficking of children, in violation of 18 U.S.C. § 1591; sexual exploitation of children, in violation of 18 U.S.C. § 2251; certain activities relating to material involving the sexual exploitation of children, in violation of 18 U.S.C. § 2252; and coercion and enticement, in violation of 18 U.S.C. § 2422.

153.    The acts of sex trafficking of children, in violation of 18 U.S.C. § 1591; sexual exploitation of children, in violation of 18 U.S.C. § 2251; certain activities relating to material involving the sexual exploitation of children, in violation of 18 U.S.C. § 2252; coercion and enticement, in violation of 18 U.S.C. § 2422; transportation of minors, in violation of 18 U.S.C. § 2423; and laundering of monetary instruments, in violation of 18 U.S.C. § 1956, set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

154.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff Sojourner Center has been injured in its business and property, including in that Sojourner Center has diverted resources to handle the increased sex trafficking in Arizona and in the United States that is the direct result of the Sex Trafficking Enterprise; many of the trafficked adults and children that Sojourner Center provides services for have been trafficked on Backpage and its affiliated websites, which was directly and proximately caused by Defendants' maintenance and control of the Sex Trafficking Enterprise.

## SECOND CAUSE OF ACTION

### (VIOLATIONS OF RICO 18 U.S.C. § 1962(a))

### *Against All Defendants*

155.     Plaintiff repeats and realleges paragraphs 1 through 154 as if fully set forth herein.

156.     Defendants have all knowingly received income that was derived from a pattern of racketeering activity, namely through the Sex Trafficking Enterprise.  The Sex Trafficking Enterprise was engaged in activities affecting interstate commerce.

157.     Defendants received income derived from a pattern of racketeering activity consisting of the related predicate acts of racketeering described in paragraphs 103 through 147 above.

158.     Defendants have used such income to support and further the Sex Trafficking Enterprise by investing that income into various Defendant businesses that obscure the source and destination of transactions that occur on their websites and are in furtherance of the Sex Trafficking Enterprise's activities.  Defendants have set up a web of entities and websites that are interconnected to increase their co-conspirators' exposure to potential purchasers while decreasing their potential for being caught by law enforcement.  For example, Defendants took illegitimate proceeds derived from sex traffickers and paid to Backpage and invested them in BigCity and EvilEmpire.  As a result of the functioning of BigCity and EvilEmpire, the number of trafficked adults and children increased for the reasons explained in paragraphs 90 through 102.

159.     As a direct and proximate result of the investments made by Defendants in their interrelated entities and websites, sex trafficking in Arizona and in the United States has increased more than it would have absent the Sex Trafficking Enterprise.

160.     As a direct and proximate cause of Defendants' conduct, including as the result of the increase in sex trafficking in Arizona and in the United States, Sojourner Center has been injured in its business and/or property, including as set forth above.

### THIRD CAUSE OF ACTION

### (VIOLATIONS OF RICO 18 U.S.C. § 1962(b))

*Against All Defendants*

161.     Plaintiff repeats and realleges paragraphs 1 through 160 as if fully set forth herein.

162.     Defendants have knowingly acquired and maintained an interest in and control of the Sex Trafficking Enterprise.

163.     As a result of the acquisition and maintenance of the websites and entities that Defendants control and maintain, sex trafficking in Arizona and in United States has increased more than it would have absent the Sex Trafficking Enterprise.

164.     As a direct and proximate cause of Defendants' conduct, including as the result of the increase in sex trafficking in Arizona and in the United States of America, the Sojourner Center has been injured in its business and/or property, including as set forth above.

### FOURTH CAUSE OF ACTION

### (VIOLATIONS OF RICO 18 U.S.C. § 1964(d))

*Against All Defendants*

165.     Plaintiff repeats and realleges paragraphs 1 through 164 as if fully set forth herein.

166.     As set forth above, Defendants agreed and conspired to violate 18 U.S.C. §§ 1962(a) (b) and (c), including in that Defendants agreed and conspired to: (1) use and invest income that is derived from a pattern of racketeering activity in the Sex Trafficking Enterprise (§ 1962(a)); (2) acquire or maintain an interest in the Sex Trafficking Enterprise (§ 1962(b));

and (3) conduct and participate in the conduct of the affairs of the Sex Trafficking Enterprise through a pattern of racketeering activity (§ 1962(c)).

167.    As a direct and proximate cause of Defendants' conduct, including as the result of the increase in sex trafficking in Arizona and in the United States, Sojourner Center has been injured in its business and/or property, including as set forth above.

## FIFTH CAUSE OF ACTION:

### (PUBLIC NUISANCE)

### *Against All Defendants*

168.    Plaintiff repeats and realleges paragraphs 1 through 167, as fully set forth herein.

169.    Backpage's "Adult Services" section is an unreasonable interference with a right common to the general public.  It involves a significant interference with the public health, public safety and the public peace.  A large number of children and vulnerable adults are subjected to physical and sexual abuse, hazardous working conditions, and continuous trauma. The interference is not confined to just those trafficked individuals, as the surrounding communities suffer as well because public resources are drained to treat these trafficking victims.

170.    As a direct and proximate cause of Defendants' actions, Sojourner Center has been harmed.  Defendants have harmed Sojourner Center by forcing it to divert its limited resources from its mission to end domestic violence to, instead, provide support for trafficking victims.  Sojourner Center has expended time, money, staffing, training, and educational resources to combat human trafficking and care for trafficking victims that it would have otherwise spent on domestic violence victims and ending domestic violence.

## SIXTH CAUSE OF ACTION:

### (NEGLIGENCE)

### *Against All Defendants*

171.    Plaintiff repeats and realleges paragraphs 1 through 170 as fully set forth herein.

172.    Defendants have a duty to avoid facilitating human trafficking and a duty to follow Arizona's anti-trafficking criminal statutes.  These criminal provisions define the public

policy of Arizona.

173. Defendants breached that duty because at all relevant times, they knew or should have known that traffickers used Backpage to post advertisements selling trafficked adults and children. Defendants took no precautions to prevent that misconduct. In fact, Defendants worked, in bad faith, with the traffickers to facilitate the trafficking.

174. As a direct and proximate cause of Defendants' actions, Sojourner Center has been harmed. By participating in trafficking children and adults and creating a website that ensures successful trafficking transactions free of interference from law enforcement, Defendants harmed Sojourner Center. Sojourner Center's harm includes the cost of hiring additional staff members to interview and treat trafficking victims and creating organization-wide training on how to care for trafficking victims.

## DEMAND FOR JURY TRIAL

175. Pursuant to Federal Rule of Civil Procedure 38 and the extent permitted by law, Plaintiff demands a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court enter judgment as follows:

a)  Adjudge that Defendants are liable for each cause of action stated above;

b)  For preliminary and permanent injunctive relief;

c)  For declaratory relief;

d)  For monetary damages, including compensatory, punitive, and treble damages;

e)  For all costs and fees incurred in prosecuting this Complaint;

f)  For such other and further relief as this Court deems just and proper.

DATED this 7th day of February, 2017.

**BOIES SCHILLER FLEXNER LLP**

By s/David Boies
    David Boies (Pro Hac Vice Application Pending)

    Karen A. Chesley
    (Pro Hac Vice Application Pending)
    Joanna Wright

1    Benjamin Margulis
     Dan G. Boyle
2    Alexander Boies
     Ruby J. Garrett
3    575 Lexington Avenue
     New York, NY 10022
4    Telephone: (212) 446-2300
     Facsimile:  (212) 446-2350
5    kchesley@bsfllp.com
     jwright@bsfllp.com
6

7

8

9    **COPPERSMITH BROCKELMAN PLC**

10

11   By s/Andrew S. Gordon
         Andrew S. Gordon
12       Vidula U. Patki
     *Attorneys for Plaintiff Sojourner Center*

13

14   **LEGAL MOMENTUM**

15

16   By s/Carol Robles-Román
         Carol Robles-Román
17       Penny Venetis
         O. Iliana Konidaris
18       Caitlin McCartney
         16 East 34th Street
19       New York, NY 10016
         Telephone: (212) 413-7544
20

21

22

23

24

25

26

27

28